**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| CITY PENSION FUND FOR FIREFIGHTERS AND POLICE OFFICERS IN THE CITY OF MIAMI BEACH, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AEROVIRONMENT, INC., WAHID NAWABI, KEVIN P. MCDONNELL, and MARY CLUM, <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by AeroVironment, Inc. ("AeroVironment" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning AeroVironment; and (d) other public information regarding the Company.

**INTRODUCTION**

1.      This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired shares of AeroVironment common stock beginning at 4:30 PM

ET on  June 24, 2025, through June 18, 2026, inclusive (the "Class Period").  The claims asserted herein are alleged against AeroVironment and certain of the Company's current executive officers, and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.     AeroVironment is a defense technology provider.  Shortly before the Class Period, AeroVironment completed its acquisition of BlueHalo, LLC ("BlueHalo"), another defense technology company whose key strengths included a leading role in the U.S. Department of Defense's ("DoD's") Satellite Communications Augmentation Resource ("SCAR") program. Through SCAR, BlueHalo had been awarded a contract valued at approximately $1.7 billion to develop military satellite command and control stations known as Broad Area Deployable Ground Terminal Enabling Resilient Communications ("BADGERs").

3.     Throughout the Class Period, Defendants repeatedly touted the SCAR program and the Company's production of BADGERs as central to AeroVironment's growth prospects. Defendants told investors that the Company had "won" the SCAR contract, that it was "locked in," that the customer was "asking for more," and that the Company was "very much on track" to ramp revenue and improve margins as more BADGER systems moved into production.

4.     Defendants' Class Period representations concerning the SCAR agreement were false.  In truth, AeroVironment's agreement with the U.S. DoD to produce BADGERs for the SCAR program was not secure, AeroVironment was facing a significant threat of competition from other vendors for the work it was performing under that agreement, and there was a material risk that the Company would not continue to deliver products for the SCAR program, or would do so only on a significantly reduced basis.

5.      The truth began to emerge on January 20, 2026, when AeroVironment announced that the U.S. Government had issued a stop work order on the Company's agreement to deliver BADGER systems to support the SCAR program.  As a result of this disclosure, the price of AeroVironment common stock declined by $61.97 per share, or 16%.

6.      Then, on March 2, 2026, industry publication *Space News* reported that the U.S. DoD was reopening the SCAR program and soliciting proposals from vendors other than AeroVironment because the Space Force was "reassessing how to move forward."  That news caused the price of AeroVironment common stock to decline by $43.93 per share, or 17%. Defendants nevertheless continued to downplay the threat to the SCAR agreement and the likelihood that revenues from the program would be reduced.

7.      On March 10, 2026, after the market closed, AeroVironment further revealed that the U.S. Government had informed the Company that it intended to terminate the SCAR agreement, while allowing AeroVironment to compete for work under the program in the future. The Company also reported a $151.3 million goodwill impairment charge in the Space reporting unit triggered by the SCAR stop work order.  These disclosures caused the price of AeroVironment common stock to decline by $13.84 per share, or 6%.

8.      Then, on June 22, 2026, AeroVironment disclosed that its previously issued financial statements should no longer be relied upon because the Company had understated the goodwill impairment charge by $89.4 million, or 59%.  AeroVironment further disclosed that the restatement resulted from a newly identified material weakness in internal control over financial reporting and that its disclosure controls and procedures as of January 31, 2026, were ineffective. As a result of these disclosures, the price of AeroVironment common stock declined by $18.28 per share, or 11%.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock when the truth was revealed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5, promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1331 and 1337.

11.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  AeroVironment is incorporated in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.      Plaintiff

12.      Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach is a pension fund established for the benefit of current and retired firefighters and police officers of the City of Miami Beach, Florida.  As indicated in the certification submitted herewith, Plaintiff purchased shares of AeroVironment common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.      Defendants

13.      Defendant AeroVironment is incorporated in Delaware and maintains its corporate headquarters at 241 18th Street South, Suite 650, Arlington, Virginia.  The Company's common

stock trades on NASDAQ under the ticker symbol "AVAV." As of June 24, 2026, AeroVironment had over 50 million shares of common stock outstanding, owned by hundreds of thousands of investors.

14. Defendant Wahid Nawabi ("Nawabi") served as AeroVironment's President and Chief Executive Officer ("CEO") at all relevant times. Defendant Nawabi also served as Chairman of the Board of Directors at all relevant times.

15. Defendant Kevin P. McDonnell ("McDonnell") served as AeroVironment's Chief Financial Officer ("CFO") at all relevant times.

16. Defendant Mary Clum ("Clum") has served as AeroVironment's President of Space, Cyber & Directed Energy Business since October 24, 2025. Previously, Defendant Clum served as President of BlueHalo's Product and Space Systems portfolio.

17. Defendants Nawabi, McDonnell, and Clum are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with AeroVironment, possessed the power and authority to control the contents of AeroVironment's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

18.    AeroVironment is a defense technology provider across air, land, sea, space, and cyber. It develops and manufactures a large proportion of its technologies for the U.S. DoD or allied foreign governments under a variety of government contracts.

19.    On May 1, 2025, AeroVironment completed its acquisition of BlueHalo in an all-stock transaction with an enterprise value of approximately $4.1 billion. BlueHalo was also a defense technology provider, which primarily operated in the counter-unmanned aircraft systems ("counter-UAS"), unmanned maritime systems, space technologies, electronic warfare, and cyber end markets. One of BlueHalo's key value drivers was its leading role in the U.S. DoD's SCAR program, launched in 2022 to ease pressure on the U.S. Space Force's aging Satellite Control Network. As part of SCAR, BlueHalo had been awarded a $1.4 billion no-bid contract with the U.S. DoD to develop a series of military satellite command and control stations, known as BADGERs. This contract value subsequently increased by $300 million to a total of $1.7 billion by the start of the Class Period.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

20.    The Class Period begins at 4:30 PM ET on June 24, 2025, when AeroVironment held its earnings call for the fourth quarter of fiscal year 2025. During the earnings call, Defendant Nawabi claimed that "recently the U.S. Department of Defense reiterated the importance our solutions and capabilities play in national defense strategy from precision fires and loitering munitions, autonomous counter UAS and to space technologies, cybersecurity solutions, and advanced munitions." He also stated that the Company was "positioned very, very well in" categories including "space communications." Defendant Nawabi named the SCAR program as one of "several very serious large growth potential opportunities in front of us," and told investors

6

that the Company had "won" the SCAR contract, stating "[i]t's worth about a $1.7 billion program funded through the Congressional budget documents.  We can scale that and expedite deliveries in the fiscal year 2026 and beyond."

21.     On the same earnings call, Defendant McDonnell assured investors that "[o]ur visibility to the midpoint of the revenue guidance range is at 70%," and clarified that this included BlueHalo.

22.     On September 9, 2025, AeroVironment held a conference call with analysts to discuss the Company's earnings and operations for the first quarter of fiscal year 2026.  On that call, Defendant Nawabi told investors that "we're confident that our BADGER phased array solution," "will be [a] key growth driver[] for the segment in the future."

23.     On September 30, 2025, AeroVironment held its Investor Open House at its Space and Directed Energy facility in Albuquerque, New Mexico, where the BADGER product is built. During the Investor Open House, Defendant Nawabi emphasized the importance of SCAR, commenting that "SCAR and our BADGER space comms is really key. That's a $1 billion franchise."

24.     Also at the Investor Open House, Defendant Clum highlighted the "program win" of SCAR, commenting that "[i]t's an awarded value of $1.7 billion, extending all the way through . . . 2030." Defendant Clum further stated that AeroVironment's SCAR "solution" is "in very high demand with the Space Force," and that "[w]e put our entire team shoulder to shoulder with the customer.  We listen, we adapt and we designed with them." She represented to investors that "SCAR's a program locked in, in a very high barrier to entry market," and that "the customer is asking for more. We're ready to build more."

25.    During a question-and-answer session at the Goldman Sachs Industrials and Materials Conference on December 3, 2025, Defendant Nawabi listed the SCAR program as one thing "that's going to contribute to the growth" of AeroVironment over the next several years.  He told investors that "[t]hat's a program that we've won.  It's $1.7 billion worth of funding that's going to be put into that to modernize the entire U.S. space satellite, geosynchronous satellites with our systems phased arrays."

26.    On December 9, 2025, Defendants announced AeroVironment's fiscal year 2026 second quarter results and held a related earnings call.  During the earnings call, Defendant Nawabi told investors that AeroVironment had "secured a new firm fixed price option for two BADGER Phased Array Systems under the SCAR" program and that the SCAR "program represents a tremendous growth opportunity for [AeroVironment] as more BADGER systems move into production."  He further stated that AeroVironment was "shifting now from development activity to delivering products," for the SCAR program which "not only ramps up the revenue for the second half of the year, but also improves the margin profile of that business."

27.    During this call, Defendant Nawabi also assured investors that "we're very much on track with our plans," with regard to the SCAR program and "[w]e're pleased with the performance so far, and we expect the margins as well as the revenue of that business to actually improve in the third and fourth quarter of this year and continue to improve beyond this fiscal year."

28.    The statements set forth above in ¶¶ 20-27 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, the contract that AeroVironment had with the U.S. DoD to produce BADGERs for the SCAR program was not

secure and AeroVironment was facing a significant threat of competition from other vendors for the work it was performing under that contract.

## THE TRUTH EMERGES

29.     On January 20, 2026, AeroVironment announced that the U.S. Government had issued a stop work order on the Company's agreement to deliver BADGER systems to support the SCAR program, "upon mutual agreement" with the Company.  This disclosure caused the price of AeroVironment stock to decline by $61.97 per share, or 16%, from a closing price of $392.86 per share on January 16, 2026, to a closing price of $330.89 per share on January 20, 2026.

30.     Despite this disclosure, AeroVironment continued to mislead investors, representing in this announcement that the "stop work order allows for the parties to negotiate an amended agreement for the future of the SCAR program," and that the "Company expects to continue to deliver capabilities and products for the SCAR program."

31.     The statements referenced in ¶ 30 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, there was a significant risk that AeroVironment would not continue to deliver products for the SCAR program, or that the extent to which the Company would deliver products under the program would be significantly reduced, due to competition from other vendors.

32.     On March 2, 2026, the industry media outlet *Space News* reported that the U.S. DoD was reopening the SCAR program and soliciting proposals from vendors other than AeroVironment as the Space Force was "reassessing how to move forward."  The *Space News* article quotes Colonel Owen Stevens, the director of contracting at the Space Rapid Capabilities Office, which supervised SCAR, as commenting that "We have been in conversations with the SAE [senior acquisition executive] for a little while now, and we are going to move into a new

acquisition strategy for SCAR." Colonel Stevens was further quoted as stating that this new acquisition strategy "will likely take the form of other companies building versions or variants of SCAR," and that the Space Force "will likely introduce other vendors into the mix." This news caused the price of AeroVironment stock to decline by $43.93 per share, or 17%, from a closing price of $252.25 per share on February 27, 2026, to a closing price of $208.32 per share on March 2, 2026.

33.    AeroVironment continued to downplay the threat to the SCAR agreement and misrepresent the likelihood and extent of continuing revenues from the program. For example, on March 2, 2026, Defendant McDonnell participated in a fireside chat at the Citizens Technology Conference, where he was asked about the SCAR program and the news that had emerged in the *Space News* article earlier that day. Defendant McDonnell stated that "we have a fixed price and a set delivery schedule and all the things that comes with that, and that's the process we're in now of negotiating that go-forward contract." He reiterated that "We didn't cancel the contract. We're still on the program. We still have a contract." In direct response to the news that the Space Force was soliciting proposals from other vendors, Defendant McDonnell assured investors that "we're multiple years ahead of any particular competitors in the market. So, it's a little bit of a game of them trying to make us go faster, I think."

34.    AeroVironment also issued a press release on March 3, 2026, stating that the Company "remain[s] in active negotiations" regarding the SCAR program and that "the contract was temporarily paused while both parties work together on a firm-fixed-price contract that provides a commercialized product solution with an expedited delivery timeline." The press release also assured investors that "AV is confident in its ability to successfully deliver our systems ahead of competitors."

10

35. The statements referenced in ¶¶ 33-34 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, the negotiations with the U.S. Government were deteriorating and there was a significant chance that the U.S. Government would terminate the agreement for AeroVironment to provide BADGER products in support of the SCAR program in favor of opening the program up to other vendors.

36. Then, on March 10, 2026, after the market closed, AeroVironment filed with the SEC a current report on Form 8-K, announcing third quarter results for fiscal year 2026 and revealing that the U.S. Government had "informed the Company that it now intends to proceed with a termination for convenience of the Agreement, while providing the Company with the opportunity to compete for work under the SCAR program in the future." AeroVironment also reported a net operating loss of $179 million for the quarter, driven by a $151.3 million goodwill impairment charge in the Space reporting unit, triggered by the SCAR stop work order the Company received in January. These disclosures caused the price of AeroVironment stock to decline by $13.84 per share, or 6%, from a closing price of $221.57 per share on March 10, 2026, to a closing price of $207.73 per share on March 11, 2026.

37. In the wake of these disclosures, Defendants continued to misrepresent the status of the SCAR agreement and also misrepresented the reliability of AeroVironment's goodwill impairment calculation. During the earnings call on March 10, 2026, Defendant Nawabi explained that "we could not come to a mutually acceptable agreement with our customer to modify the existing contract and resume work," and that "the U.S. Space Force has concluded to terminate our existing contract for convenience . . . and enable AV to recompete for the program." He continued to reassure investors that AeroVironment "remain[s] in active discussions with the U.S.

Space Force" regarding the program and that "we remain fully committed to delivering this innovative capability to the market while aligning to our customers' needs."

38.     On the same call, Defendant McDonnell told investors that the testing that led to the goodwill impairment "was triggered by the SCAR stop work order," but that "[w]e do not expect any further adjustments to the impairment as a result of the notification of the customer to terminate the contract for convenience."    He also informed investors that he expected an adjustment to the Company's $3 billion of unfunded backlog going forward, as "approximately $1.5 billion of the unfunded backlog relates to the SCAR program."

39.     The next day, on March 11, 2026, AeroVironment filed its Quarterly Report on Form 10-Q with the SEC for the third quarter of fiscal 2026.  That Quarterly Report stated that the goodwill impairment for the quarter was $151.3 million, and that the Company's goodwill balance at January 31, 2026, was $2.46 billion.  It also represented that "our Chief Executive Officer and Chief Financial Officer concluded that, as of January 31, 2026, the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective and were operating at a reasonable assurance level."

40.     The statements referenced in ¶¶ 37-39 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, the Company had understated the goodwill impairment charge to the Space reporting unit and its disclosure controls and procedures were materially deficient.

41.     Then, on June 22, 2026, AeroVironment filed with the SEC a current report on Form 8-K, announcing that its financial statements filed in its prior quarterly report on March 11, 2026, "require restatement and should no longer be relied upon," because the goodwill impairment

12

calculation was grossly understated.  The current report further explained that the impairment charge had been understated by $89.4 million, bringing the total corrected goodwill impairment charge to $240.7 million, and attributed this to "an error in the calculation of the carrying value used in the goodwill impairment analysis of the Space reporting unit."  The Company further disclosed that "the error and the related restatements were the result of a newly identified material weakness in the Company's internal control over financial reporting," and that "the disclosure controls and procedures as of January 31, 2026 were ineffective."  As a result of these disclosures, the price of AeroVironment stock declined by $18.28 per share, or 11%, from a closing price of $169.61 per share on June 18, 2026, to a closing price of $151.33 per share on June 22, 2026.

## LOSS CAUSATION

42.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of AeroVironment common stock and operated as a fraud or deceit on the Class (as defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of AeroVironment stock fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their purchases of AeroVironment common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of AeroVironment during the Class Period (the "Class").  Excluded from

13

the Class are Defendants and their families, directors, and officers of AeroVironment and their families and affiliates.

44.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of June 24, 2026, AeroVironment had over 50 million shares of common stock outstanding, owned by hundreds of thousands of investors.

45.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)    Whether Defendants' conduct impacted the price of AeroVironment common stock;

(g)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

14

(h)    The extent of damage sustained by Class members and the appropriate measure of damages.

46.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

47.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

48.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

<strong><u>INAPPLICABILITY OF STATUTORY SAFE HARBOR</u></strong>

49.    AeroVironment's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

50.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of AeroVironment who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

51.    At all relevant times, the market for AeroVironment common stock was an efficient market for the following reasons, among others:

(a)    AeroVironment common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, AeroVironment filed periodic public reports with the SEC and NASDAQ;

(c)    AeroVironment regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    AeroVironment was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

52.    As a result of the foregoing, the market for AeroVironment common stock promptly digested current information regarding AeroVironment from all publicly available sources and reflected such information in the price of AeroVironment common stock.  Under these circumstances, all purchasers of AeroVironment common stock during the Class Period suffered similar injury through their purchase of AeroVironment common stock at artificially inflated prices and the presumption of reliance applies.

53.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

16

because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding AeroVironment's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the BlueHalo acquisition and the SCAR agreement, that requirement is satisfied here.

## SCIENTER ALLEGATIONS

54.     As alleged herein, the Defendants acted with scienter since the Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Numerous facts, including those detailed below, considered collectively, demonstrate that Defendants knew or recklessly disregarded that they were misrepresenting the status of the Company's agreement to produce BADGERs for the SCAR program and the threat of competition that agreement was facing from other vendors.

55.     The SCAR program was an important part of AeroVironment's business and was a pillar of the BlueHalo acquisition, the largest acquisition in the Company's history. Defendants repeatedly emphasized the agreement as a core source of growth for the Company and specifically referenced their close communication with the U.S. Space Force, stating that "[w]e put our entire team shoulder to shoulder with the customer. We listen, we adapt and we designed with them."

56.     Further, capitalizing on AeroVironment's inflated stock price, AeroVironment's senior executives reaped significant personal financial gains by selling over $7.5 million worth of

17

their personally held AeroVironment shares during the Class Period. Specifically, Defendant Nawabi sold over $4.5 million of his personally held shares at the same time that Defendants were issuing materially false and misleading statements and omissions to investors. Similarly, Defendant McDonnell sold almost $1.4 million of his personally held shares during the Class Period. These sales were suspiciously timed and constituted a material departure from these Defendants' trading behavior in the period directly preceding the Class Period.

57.    Collectively, these facts give rise to a strong inference of scienter.

## CLAIMS FOR RELIEF

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

58.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

59.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase AeroVironment common stock at artificially inflated prices.

60.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for AeroVironment common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

61.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

62.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal AeroVironment's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AeroVironment common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for AeroVironment common stock had been artificially inflated by Defendants' fraudulent course of conduct.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

66.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

67.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

68.    The Individual Defendants acted as controlling persons of AeroVironment within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about AeroVironment, the Individual Defendants had the power and ability to control the actions of AeroVironment and its employees.  By reason of such conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

69.    WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

70.     Plaintiff demands a trial by jury.

DATED: July 17, 2026

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

*/s/ Anthony M. Calvano*
Anthony M. Calvano (DE Bar ID #6265)
Gregory V. Varallo (DE Bar ID #2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3600
anthony.calvano@blbglaw.com
greg.varallo@blbglaw.com

-and-

Hannah Ross
Scott R. Foglietta
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
hannah@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach*

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON, P.A.
Robert D. Klausner
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach*

21